MULLER et al. v. NEW YORK, N. H. & H. R. CO.

(District Court, S. D. New York. March 10, 1906.)

1. COLLISION—DISABLED VESSEL—RIGHT TO ANCHOR.

When a vessel, large or small, becomes disabled and loses her motive power, if she cannot safely find a mooring place by the land, she is justified in anchoring where she is, as safer for herself and other vessels than drifting.

2. SAME—TOW AND ANCHOR LAUNCH—FAILURE TO CARRY ANCHOR LIGHT.

A small launch, which had become disabled in the night, and anchored in the channel in East river, near Hell Gate, held not entitled to recover for her injury by collision with a car float on the side of a tug which ran into her, on the ground that she did not carry the anchor light required by the rules, which would have prevented the collision, although the tug did not have a proper lookout; it appearing that she saw the light from the launch as soon as it was raised into view.

In Admiralty. Suit for collision.

Alexander & Ash, for libellants.

William Greenough and Joseph H. Choate, Jr., for respondent.

144 F.—16

ADAMS, Circuit Judge. This action was brought by John Muller, Charles Muller, George Muller, and August Wedesweiler, the owners of a launch, 28 feet long, called the Victoria, to recover from the New York, New Haven & Hartford Railroad Company, the damages caused to the launch by collision with a carfloat in tow on the starboard side of the company's tug Transfer No. 3, in the East River from 100 to 150 feet from Steep Rocks, a little beyond Hell Gate, about 3 o'clock in the morning of July 3rd, 1905. The launch was bound from 122nd Street, Harlem River, to North Beach, just above Flushing Bay and Oak Point. The weather was clear and the tide ebb. The launch met with a derangement of her machinery after passing through the Gate and anchored to effect repairs. The tug, with a loaded float on each side, projecting about 130 feet ahead of the tug, was proceeding through the Gate to Oak Point. When the tug discovered the light of the launch, she had just passed the steamer Allan Joy, bound westward, after an exchange of signals. The white light of the launch was then seen ahead and the tug blew alarm whistles, slowed and soon thereafter stopped and reversed, nearly stopping her headway. The collision, however, took place, but without much force, the port float striking the starboard quarter of the launch forcing her around so that she was brought across the bows of both floats. The tow was still under some headway and her forward movement broke the anchor rope of the launch. The tow shortly afterwards came to a stop and as soon as the pressure was removed, the launch was taken around on the outside of the starboard float with the remains of the anchor rope. The launch filled with water rapidly after that. One of the libellants being fearful that the anchor rope would not stand the towing strain, used another rope from the float for additional security and the tow proceeded towards Oak Point. The libellants asked those on the tow to run the launch ashore somewhere but the reply was that it could not be done; that they must go to Oak Point. When nearing Oak Point, the launch was taken away by another tug belonging to the respondent but before she could be landed she got adrift and subsequently became a total loss.

This action was afterwards commenced, the foregoing facts being substantially alleged, and the following charges of fault were made against the tug:

"(1) In that said Transfer 3 did not have a competent person in charge properly stationed and attending to duty. (2) In that she did not have and maintain a proper and sufficient lookout. (3) In that she did not observe the launch Victoria in time and take timely precautions to pass in safety. (4) In that she brought her tow into contact with the Victoria which was at anchor and incapable of motion. (5) In that she attempted to run too close to the Victoria at a place where there was ample sea-room, and no necessity for her so doing. (6) In that she did not keep well away from said anchored vessel as was her duty. (7) In that instead of promptly beaching the Victoria after the collision, in shoal-water, which could readily have been done, and said vessel saved, the respondent, its agents and servants towed said launch up to Oak Point, and caused and permitted her to sink in deep water, and become a total loss."

The respondent alleged that after the signal to the Joy, a white light was seen on a vessel dead ahead, between 100 and 150 feet off shore, which afterwards proved to be the launch, anchored with the

light on her stern; that when the tug's headway was nearly stopped, the launch was driven against the bows of the floats by a swell raised by the Joy, which had just passed. The respondent denied all charges of fault against the tug and alleged that the accident was solely due to the negligence of those in charge of the launch, in the following particulars:

"(1) In that said launch failed to carry the light required by law or to exhibit the same in conformity with the statutes in such case made and provided. (2) In that the place where she was anchored was not set apart as an anchorage ground and was directly in the track of vessels passing through Hell Gate. (3) In that those in charge of said launch failed to maintain a look-out while so anchored in a position to observe and warn approaching vessels of the launch's position."

Of course the place where the launch anchored was not a proper place under ordinary circumstances, but when a vessel loses her motive power, it behooves her to come to anchor as soon as possible if she cannot safely find a mooring place by the land and this applies as well to a small boat as a large vessel. The launch had some small oars aboard belonging to a row boat, which the libellants used in connection with the launch at her anchoring place, but it does not appear that there were any means of using them on the launch or that, in any event, they would have answered to row her, being designed for a much smaller boat. When the machinery became disabled, the launch was without means of propulsion and if she had not anchored would unquestionably have been in danger. It was not a locality to try experiments in and although it is urged that if those on board had permitted her to drift, she would have brought up safely in Pot Cove, that is not made clear enough to be a basis of a finding that it was her duty to drift rather than to anchor. A drifting vessel is helpless and a menace to others as well as in danger herself.

Whether the launch had a proper anchor light is the more important question. One of the libellants Muller testified that when the launch came to anchor, two of the four men aboard went down in the cockpit to make repairs to the engine, the other two stationed themselves on deck, one forward and himself aft. He said that there were several lights on board, among them a globe lantern, which was lighted when they came to anchor so that it was burning brightly and showed a white light, which was visible in ordinarily clear weather from 1½ to 2 miles. This he used as an anchor light and placed it on the deck aft, which was about 2 feet above the water. When the tow was seen coming around Hallets Point, he held up the light, so that it was 6 or 7 feet above the deck, and 8 or 9 feet above the water and could easily be seen. This witness watched the tow coming and it not being apparent that the light was seen, he commenced waving it back and forth to attract attention. The tug shortly after coming around the bend, and running towards the launch, blew one whistle, and when the light was waved blew a succession of blasts. At this time the tow was about 250 to 300 feet away. The witness continued waving the light until seeing that the tow continued its approach, he jumped down into the cockpit for safety. What then became of the light the witness does not remember but that is obviously of no importance as the collision was then inevitable. This testimony

is corroborated to some extent, by the other 3 witnesses on the launch.

The tug's testimony shows that the navigation was in control of her master, but it appears that she had no lookout. The deck hand who had acted as such, stationed in the pilot house, left his post after the tug had rounded Hallets Point and went on deck for a drink of water. The pilot house was about 140 feet aft the bows of the floats and not a proper place for a lookout; he should have been stationed forward on one of the floats, so the case must be treated as one where a collision occurs in the absence of a lookout. This is not necessarily fatal to the respondent's defense because if the launch had not a proper anchor light, she cannot recover.

The provision of law in this respect is contained in Article 11 of the Pilot Rules, p. 15 as follows:

"Art. 11. A vessel under one hundred and fifty feet in length when at anchor shall carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light, in a lantern so constructed as to show a clear, uniform, and unbroken light visible all around the horizon at a distance of at least one mile."

It is also provided by resolution of Supervising Inspectors, approved February 16, 1891, as follows:

"Resolved, that all coal boats, trading boats, produce boats, canal boats, oyster boats, fishing boats, and other water craft navigating any bay, harbor, or river, propelled by hand power, horse power, sail, or by the current of the river, or which shall be moored in or near the channel or fairway of any bay, harbor, or river, shall carry one bright white light forward, not less than six feet above the rail or deck."

The libellants' testimony is to the effect that the light, which they contend was an anchor light, was placed aft on deck. They say it remained there until after the tow came around Hallets Point, when it was held up. It was a case where strict compliance with the rule should be exacted, so far as any departure from it could affect the collision. Placing the light on the stern instead of the bow would evidently have been of no importance as such variation from the rule would have brought the light nearer the tow, so that it could be more readily seen, but giving it no elevation whatever, might easily have tended to obscure it, so that it would not be visible all around the horizon, and it is quite possible that it was so placed as it was hidden from the west, by a person sitting or standing upon the deck, and consequently not seen by those on the tug.

It is also a question whether the light, the libellants testify to, was exhibited even in the defective manner described by them. Several witnesses on the respondent's part say that it was not shown. The master of Transfer No. 11 passed the launch as she lay at anchor about half an hour before the collision. He testified that no light was visible upon her excepting one in the bottom. The master of No. 3 saw a light low down and then saw it picked up and waved. This was when the vessels were within 300 feet of each other. A floatman sitting on the bow of No. 3, the port float, where he had been for about an hour before the collision, testified that he saw first a black speck in the water, waited a little then saw "a light pop up off the bottom of the boat or come up from behind something." The man who had been

on duty looking out from the pilot house till after passing Hallets Point, saw no light at all. One of the libellants, of the two repairing the engine, said he had the anchor light in his hand to show his companion so he could see to take out the balance weight, the part that was being repaired, but, at the same time, said there was another white light of a similar character in the stern of the boat, so that his testimony may be regarded as substantiating that of the witness stationed at that place, who testified as hereinbefore shown.

After a careful examination of the testimony, I feel constrained to hold that the launch was in fault for not exhibiting a sufficient anchor light. It was incumbent upon her to establish the performance of her duty in this respect and the testimony makes it at least doubtful whether she did so. The John H. Starin, 122 Fed. 236, 58 C. C. A. 600.

It only remains to determine whether the tug was also in fault by reason of the absence of a lookout. If the testimony of the tug is true with respect to the light of the launch, and I feel that I should so consider it, then the absence of a lookout made no difference. The testimony shows that if the tug had reversed when the presence of the launch was first ascertained, there would probably have been no collision. The testimony of the tug is to the effect that she did not reverse for about 30 seconds after seeing the light and during this period she forged ahead about 100 feet while 35 feet would have sufficed to avoid the collision, but these are mere estimates and even if correct, it cannot be expected that such nice calculations will be made in a moment of danger.

The libel will be dismissed.